John R. MILLER, Plaintiff,

v.

LeSEA BROADCASTING, INC., a/k/a Le-Sea Broadcasting Corporation, d/b/a WHKE Channel 55 TV, Defendant.

No. 95–C–694.

United States District Court,
E.D. Wisconsin.

Jan. 10, 1996.

Madrigrano, Zievers, Aiello & Iaquinta by Thomas P. Aiello, Kenosha, WI, Gimbel, Reilly, Guerin & Brown by Franklyn Gimbel and Kathryn Keppel, Milwaukee, WI, for plaintiff.

O'Neil, Cannon & Hollman by Dean Laing, Milwaukee, WI, for defendant.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

On May 12, 1995, the plaintiff filed this action in the Kenosha county circuit court seeking to prevent the sale of WHKE, Channel 55 ["Channel 55"] from LeSea Broadcasting, Inc. ["LeSea"] to The Christian Network, Inc. ["CNI"]. Channel 55 is a television station owned by LeSea and operating in Kenosha, Wisconsin. Mr. Miller also seeks to compel LeSea to sell Channel 55 to him pursuant to a right of first refusal that he holds regarding a sale of the television station by LeSea. On June 28, 1995, LeSea removed the action to this court pursuant to 28 U.S.C. § 1441(a). Jurisdiction is based upon 28 U.S.C. § 1332(a)(1).

Subsequent to removal, Mr. Miller moved for a preliminary injunction seeking to block the sale of Channel 55 to CNI. An evidentiary hearing on Mr. Miller's motion was held on August 23, 1995. In an August 29, 1995, decision and order, I granted Mr. Miller preliminary injunctive relief. Presently before the court are the parties' cross-motions for summary judgment, as well as LeSea's motion for reconsideration of the court's order granting Mr. Miller's motion for a preliminary injunction.

## I. BACKGROUND

The facts that gave rise to this action are essentially undisputed. Mr. Miller, a resident of Kenosha, is presently employed as the general manager of Channel 55. LeSea is an Indiana not-for-profit corporation with its principal place of business located in South Bend, Indiana. In August 1993, Mr. Miller and LeSea entered into an employment contract, drafted by the plaintiff, which provided Mr. Miller with a right of first refusal in the event that a third party offered to purchase the television station.

The clause in Mr. Miller's employment agreement regarding his right of first refusal provides:

> While Employee [Mr. Miller] is in the employ of Employer [LeSea] and for two (2) years thereafter, Employer hereby grants Employee the right of first refusal to purchase any interest in Employer's business property and/or interest in the business enterprise ("the property") known as Channel 55, Kenosha, Wisconsin offered to any third person or entity. Should Employer receive an acceptable Offer to Purchase ("the Offer") for said property or any portion thereof from a bona fide purchaser, Employer shall present said Offer to Employee. Employee shall have 72 hours to match said Offer upon exact terms and conditions as contained in the Offer of any third-party bona fide purchaser. This right of first refusal must be exercised in writing and transmitted to Employer either personally or by fax within 72 hours of receipt of the Offer by Employee.

On January 9, 1995, Paxson Communications Corporation ["Paxson"] sent a letter to LeSea stating Paxson's willingness to enter into an agreement with the defendant, "through an affiliated entity to be formed," to purchase Channel 55 for the sum of $2,500,-000. Paxson's letter also stated that it would agree to place $200,000 in an escrow account,

which would be forfeited to LeSea in the event that Paxson wrongfully failed to close the prospective purchase agreement with Le-Sea.

LeSea provided the plaintiff with a copy of Paxson's letter. In a January 23, 1995, letter, Mr. Miller responded to LeSea and requested that he be presented with the terms and conditions of any offer to purchase Channel 55 "[a]t such time as an offer to purchase is executed." Paxson's letter of intent expired on February 24, 1995, without any further activity.

On March 31, 1995, LeSea entered into an asset purchase agreement with CNI which purports to sell Channel 55 to CNI. Mr. Miller learned of the agreement on April 12, 1995. On April 13, 1995, the plaintiff faxed to LeSea's president, Stephen Sumrall, a letter stating that he was exercising his right of first refusal. In that letter, Mr. Miller stated that an account was established at Heritage Bank of Kenosha, in the name of Joseph F. Madrigrano, Jr. for the benefit of the plaintiff in the sum of $200,000. That sum represented the amount that the plaintiff would be obligated to pay as a down payment for the purchase of Channel 55. At the preliminary injunction hearing, Mr. Miller testified that, contrary to his statement in the letter, no funds were ever deposited in that account. However, the plaintiff did have funds available at various times from Joseph Madrigrano, Sr. and Pappas Telecasting Companies ["Pappas"]. Mr. Madrigrano and Pappas were ready to deposit $200,000 into his account if and when they were informed that Mr. Miller's offer to purchase Channel 55 had been accepted by LeSea.

On April 18, 1995, counsel for LeSea wrote a letter to Joseph Madrigrano, Jr., an attorney for the plaintiff, inquiring whether Mr. Miller "unequivocally and unconditionally agrees to match the terms and conditions" of the defendant's purchase agreement with CNI. On April 20, 1995, Thomas Aeillo, one of the plaintiff's attorneys in the present action, wrote to Stephen Sumrall and to counsel for LeSea stating that Mr. Miller "hereby unconditionally and unequivocally matches the terms and conditions" of Le-Sea's agreement with CNI.

Section 11.13 of LeSea's agreement with CNI provides that Paxson will guaranty the $2,500,000 purchase price and all obligations assumed by CNI under the agreement. Paxson and CNI, or one of its subsidiaries, have purchased two other television stations. In each of those transactions, CNI, or a subsidiary of CNI, purchased the station in concert with Paxson. In each instance, Paxson became the manager of CNI's station. Mr. Miller represented to LeSea that he could obtain a guaranty from Pappas for the purchase of Channel 55.

LeSea and Mr. Miller exchanged various correspondence during the latter part of April 1995 and the first two weeks of May 1995. On May 15, 1995, LeSea provided the plaintiff with a proposed asset purchase agreement for the purchase of Channel 55 that was essentially identical to the agreement between LeSea and CNI, save for the replacement of CNI with Mr. Miller's name, and the replacement of Paxson with Pappas' name.

Absent from the proposed asset purchase agreement that LeSea offered to Mr. Miller is section 11.14, entitled "Inducement to Buyer." This section had been included in the asset purchase agreement between LeSea and CNI. Section 11.14 provides:

*Inducement to Buyer.* As an inducement to Buyer to enter into this Agreement, Seller covenants that in the event that a court of competent jurisdiction issues a final decision that holds that John Miller, by virture [sic] of the agreement described in Section 10.2(b) hereof, is entitled to acquire all or substantially all of the Assets to be sold to Buyer hereunder, Seller shall pay to Buyer the sum of $75,000 within ten (10) business days after closing of said acquisition, which payment shall be Buyer's sole and exclusive remedy as to Seller. ***Seller further covenants that it will defend with due diligence against any effort by John Miller to assert any claim of right to acquire the Assets which are the subject of this Agreement.*** (Emphasis added.)

On May 26, 1995, Mr. Miller sent to LeSea copies of the executed asset purchase agree-

ment bearing his signature. However, the plaintiff deleted section 11.13, which was to provide for a third party guaranty. The mass media bureau of the Federal Communications Commission ["FCC"] issued a public notice which provided that the FCC would no longer approve financing arrangements such as the one between Mr. Miller and Pappas. Based on the public notice, and a subsequent FCC ruling, Pappas terminated its agreement with the plaintiff. Consequently, Mr. Miller was ultimately unable to obtain a guaranty from Pappas.

Upon receipt of Mr. Miller's executed agreement, LeSea took the position that the plaintiff failed to match the "exact terms and conditions" of the CNI agreement due to his deletion of section 11.13. The defendant concluded that Mr. Miller had lost his right of first refusal, and it proceeded with its sale to CNI.

At the preliminary injunction hearing, Peter Sumrall, vice president of LeSea, testified that he would prefer to sell Channel 55 to CNI, as it would be advantageous for LeSea, as a not-for-profit corporation, to sell the station to another not-for-profit corporation. Mr. Sumrall also testified that Paxson entered into a "local marketing agreement" ["LMA"] with CNI whereby Paxson will manage Channel 55 subsequent to the prospective sale of that station to CNI. LeSea had previously entered into an agreement in 1992 to sell Channel 55 for $1,300,000, but that agreement was never consummated.

Channel 55 has not been profitable during LeSea's ownership of the station. Between 1988 and 1994, Channel 55 sustained a net loss in excess of $2,200,000. Through the first seven months of 1995, Channel 55 sustained a net loss in excess of $330,000.

## II. MOTION FOR RECONSIDERATION

In its motion for reconsideration, LeSea requests that I reverse my August 29, 1995, decision and order granting preliminary injunctive relief to the plaintiff. The defendant seeks an order quashing the preliminary injunction based on its assertion that Mr. Miller concealed significant facts from the court which "would have uncontrovertedly demonstrated his failure to meet one of the ele-

ments required in order for him to obtain a preliminary injunction." Specifically, LeSea contends that Mr. Miller has an adequate remedy at law in the form of a money judgment if he ultimately prevails in this case.

In support of its motion, the defendant has submitted the affidavit of Dean Laing. Attached to Mr. Laing's affidavit is a May 26, 1995, agreement between Mr. Miller and Pappas and an August 22, 1995, letter of intent between Mr. Miller and Fant Broadcasting Company of Alabama, L.L.C. ["Fant"]. Under their respective agreements with Mr. Miller, both Pappas and Fant could purchase Channel 55 for $500,000 more than the $2.5 million purchase price subsequent to the sale of the station to Mr. Miller.

■ A motion for reconsideration serves a limited purpose. *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1982), *aff'd*, 736 F.2d 388 (7th Cir. 1984). The purpose of such a motion is to correct manifest errors of law or fact or to present newly discovered evidence that could not have been presented during the pendency of the motion. *See Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.1987). LeSea's motion is based upon evidence that it contends was unknown to it until after the hearing on Mr. Miller's motion for a preliminary injunction.

■ Contrary to the defendant's suggestion, I do not believe that the plaintiff's failure to alert the court to the specific terms of his agreements with Pappas and Fant amounts to a meaningful lack of candor on the part of Mr. Miller. Does the plaintiff's intention to resell the station relieve LeSea of its contractual duty to honor Mr. Miller's right of first refusal? If one enters into a contract to purchase a Rembrandt, can the seller avoid specific performance because his buyer plans to resell it at a profit?

■ For the same reasons that I discussed in granting the preliminary injunction, I believe that under all the circumstances of this case Mr. Miller has a right to the remedy of specific performance. Why else would Mr. Miller (as well as CNI and Paxson) be willing to pay LeSea $2,500,000

or more for a company that has lost millions between 1988 and 1994, and has lost $330,000 between January and July 1995? The answer is that a television station, unlike a carload of potatoes or an inventory of bicycles, is in highly limited and finite supply. *See Hawaiian Paradise Park Corporation v. Friendly Broadcasting Co., Inc.,* 414 F.2d 750, 758 (9th Cir.1969) (A local television station is a unique property.). It is the unique character of the television station, rather than the purchaser's intentions after he acquires the station, that demonstrates the need for equitable relief rather than monetary damages. *See, e.g., Texaco, Inc. v. Creel,* 310 N.C. 695, 314 S.E.2d 506, 512 (1984) (Lessee holding option entitled to specific performance of contract to convey land regardless of lessee's intent to resell.). The defendant's motion to quash the preliminary injunction will be denied.

### III. CROSS–MOTIONS FOR SUMMARY JUDGMENT

In its motion for summary judgment, LeSea contends that Mr. Miller is not entitled to equitable relief because he comes to this court with "unclean hands." The defendant also maintains that the plaintiff failed to match the exact terms of CNI's offer to purchase as required by the employment agreement, and therefore failed validly to exercise his right of first refusal.

The plaintiff argues that he not only matched CNI's offer but also that LeSea has exhibited its bad faith by including section 11.14 in its agreement with CNI.

Pursuant to Rule 56(c), Federal Rules of Civil Procedure, summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In the case at bar, both parties agreed to removal of this case from the trial calendar and resolution of this action on their cross-motions for summary judgment.

The movant bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party. *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 931 (7th Cir.1995).

A federal court sitting in diversity must first apply the forum state's choice of law rules to determine which state's substantive law governs the dispute. *S.A. Healy Co. v. Milwaukee Metropolitan Sewerage Dist.,* 50 F.3d 476, 478 (7th Cir.1995). Both parties rely upon Wisconsin law in their respective motions for summary judgment. Due to the substantial connection between Wisconsin and the events which precipitated this action, I see no reason to depart from the parties' choice of law. *See Handal v. American Farmers Mut. Cas. Co.,* 79 Wis.2d 67, 73, 255 N.W.2d 903 (1977) (Choice of law in contract case is determined under the "grouping of contacts rule.").

■ LeSea asserts that Mr. Miller's untrue statement regarding his account at Heritage Bank should bar him from obtaining equitable relief. "[I]t is an equitable maxim that a party coming before the court in equity must come with clean hands." *Anweiler v. American Electric Power Service Corp.,* 3 F.3d 986, 993 (7th Cir.1993); *BeerMart v. Stroh Brewery Company,* 804 F.2d 409, 413 (7th Cir.1986). Mr. Miller requests equitable relief in the form of specific performance and a permanent injunction.

I do not believe that the plaintiff's misrepresentation regarding the deposit of $200,000 into a certain bank account amounts to wrongdoing that should foreclose his entitlement to equitable relief. Mr. Miller has submitted undisputed evidence that Joseph F. Madrigrano, Sr. had funds on deposit at Heritage Bank in excess of $200,000 and that on April 13, 1995, Mr. Madrigrano "stood ready, willing and able" to transfer $200,000 to the plaintiff's account. *Affidavit of Joseph F. Madrigrano, Sr.* ¶ 7. Subsequently, Pappas agreed to provide Mr. Miller with the $200,000 down payment. *Affidavit of How-*

*ard Goldberg* ¶¶ 3–4. Although Mr. Miller's statement was untrue, it did not adversely impact on his financial capacity to purchase Channel 55.

■ LeSea maintains that the plaintiff's failure to match exactly the terms of CNI's offer amounts to a failure on the part of Mr. Miller to make a valid exercise of his right of first refusal. Under Wisconsin law, the terms of a contract must be given their plain and ordinary meaning where the contract is free from ambiguity. *Craigs, Inc. v. General Electric Capital Corp.,* 12 F.3d 686, 688 (7th Cir.1993). A right of first refusal is a conditional option which is dependent upon the decision to sell the property by its owner. *See Last v. Puehler,* 19 Wis.2d 291, 297, 120 N.W.2d 120 (1963).

■ Pursuant to his agreement with LeSea, Mr. Miller was entitled to exercise his right of first refusal when LeSea received an acceptable offer to purchase Channel 55. Mr. Miller was diligent in exercising his contractual right. He was obligated to match "the exact terms and conditions" of any acceptable third-party offer.

Giving that phrase its facially plain meaning, the plaintiff was required to submit an offer to LeSea for the purchase of Channel 55 that was the same as the agreement between the defendant and CNI. Technically, Mr. Miller did not match the exact terms of CNI's offer; he omitted section 11.13, which provided for a third party guaranty, and section 11.14, which provided that LeSea would defend against any attempt by Mr. Miller to assert any right to purchase Channel 55. The defendant acquiesced in the omission of section 11.14. Indeed, if section 11.14 were included in LeSea's proposed purchase agreement with Mr. Miller, it would lead to the cockeyed result that LeSea would be obligated to resist Mr. Miller's making the purchase.

LeSea objects to the plaintiff's omission of section 11.13 from his offer. LeSea asserts that the guaranty provision was a material term of CNI's offer that Mr. Miller was required to match. The plaintiff contends that the guaranty was merely a sham that was intended to prevent Mr. Miller from exercising his right to purchase the television station. He points to evidence that CNI and Paxson jointly purchased two other television stations.

Some courts have interpreted the matching requirement in rights of first refusal to mean that the holder of such a right is not obligated to match unreasonable, immaterial terms in a third-party offer, where such terms are inserted merely to preclude the holder from matching the offer. *See Prince v. Elm Investment Co., Inc.,* 649 P.2d 820, 825 (Utah 1982) (" '[I]f the holder of a right of first refusal cannot meet exactly the terms and conditions of the third person's offer, minor variations which obviously constitute no substantial departure should be allowed. And defeat of a right of first refusal should not be allowed by use of special, peculiar terms or conditions not made in good faith....' " (quoting *Brownies Creek Collieries, Inc. v. Asher Coal Mining Co.,* 417 S.W.2d 249, 252 (Ky.1967))); *C. Robert Nattress & Associates v. CIDCO,* 184 Cal.App.3d 55, 229 Cal.Rptr. 33, 43 (Cal.Ct.App.1986) ("If the literal matching of terms were required, a triggering offeror could by offering some unique consideration such as ... a bag of diamonds or a herd of Arabian horses, effectively defeat the lessor's right of first refusal."); *Vincent v. Doebert,* 183 Ill.App.3d 1081, 132 Ill.Dec. 293, 298–99, 539 N.E.2d 856, 861–62 (Ill.App.Ct.1989) (Holder of right of first refusal was not required to match net worth of third party offeror.).

It is clear from the record in this case that it was always intended by CNI that Paxson would be the operating manager of the station. In short, it is clear that Paxson was more like a partner than a guarantor. Paxson's "guaranty" was an adroit way of imposing an obstacle in the path of Mr. Miller in his effort to enjoy his right of first refusal.

The inclusion of section 11.14 by LeSea in its agreement with CNI casts serious doubt on LeSea's motives. I remain persuaded that both the provisions of section 11.14 and the so-called "guaranty" were designed to impede Mr. Miller's contractual right of first refusal. The contract between the defendant and CNI demonstrates that there was unfair dealing by them in regard to Mr. Miller's

right of first refusal. LeSea admittedly preferred to sell to CNI. I conclude that LeSea attempted to exploit the "exact terms and conditions" clause to accomplish an improper goal that a court of equity should not honor under all the circumstances of this case.

 "Every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties." *Estate of Chayka*, 47 Wis.2d 102, 107 n. 7, 176 N.W.2d 561 (1970). Breach of contract may occur if a party violates the implied covenant of good faith and fair dealing. *See Ford Motor Co. v. Lyons*, 137 Wis.2d 397, 442–43, 405 N.W.2d 354 (Ct. App.), *rev. denied*, 138 Wis.2d 531, 412 N.W.2d 893 (1987).

In balancing the putative acts of error or mischief on the part of the plaintiff and the defendant, the scoreboard looks like this:

Plaintiff's errors:

a. failure to have a deposit at the Heritage Bank of Kenosha, as asserted by the plaintiff.

b. failure to disclose an anticipated resale to Fant and Pappas.

c. failure to meet the "exact" terms of the CNI offer by not providing a guaranty.

Defendant's errors:

a. agreeing with CNI in section 11.14 of the agreement between LeSea and CNI that LeSea covenants to "defend with due diligence" against any effort by Mr. Miller to assert a right to acquire the station.

b. presenting Paxson as a "guarantor" when in fact Paxson is deeply involved as a party-in-interest.

I deem the defendant's flaws far more grievous than those of the plaintiff.

### ORDER

Therefore IT IS ORDERED that the defendant's motion to quash the preliminary injunction issued on August 29, 1995, be and hereby is denied.

IT IS ALSO ORDERED that the plaintiff's motion for summary judgment be and hereby is granted.

IT IS FURTHER ORDERED that the defendant's motion for summary judgment be and hereby is denied.

IT IS FURTHER ORDERED that LeSea, its agents, and all those in active concert with it, be and hereby are permanently enjoined from consummating the sale of Channel 55 to CNI pursuant to the March 31, 1995, agreement between LeSea and CNI.

IT IS FURTHER ORDERED that LeSea specifically perform its contract with John Miller by selling Channel 55 to him.

IT IS FURTHER ORDERED that the Clerk of Court, pursuant to Rule 58, Federal Rules of Civil Procedure, be and hereby is directed to enter judgment in favor of John Miller, with costs.